IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>PAUL DONALD KIMBALL,<br><br>        Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:04-CR-178 TC |

Defendant Paul Donald Kimball has been indicted on charges of possession of a firearm by a convicted felon (18 U.S.C. § 922(g)(1)) and aiding and abetting (18 U.S.C. § 2). This matter is before the court on Mr. Kimball's Motion to Suppress Confession (Docket No. 57).

Mr. Kimball, who is and was at all relevant times serving time in state prison for a conviction unrelated to the charges pending in this case, moves the court to suppress statements he made to a prison investigator during a December 5, 2003 interview conducted at the state prison outside the presence of legal counsel. He contends that his statements must be suppressed because the interview violated his constitutional right to have counsel present during a custodial interrogation. Specifically, he contends that the interview was initiated by the prison investigator despite Mr. Kimball's earlier request for counsel (a right he invoked pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)) in violation of his rights under <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981).

For the reasons set forth below, Mr. Kimball's Motion to Suppress Confession is

DENIED.

## FINDINGS OF FACT

On the evening of December 4, 2003, Bryant Green, supervisor of the investigations unit of the Utah Department of Corrections, received a call from Kevin Pepper, an investigator for the unit. Lieutenant Pepper told Captain Green that he had received a call from prison inmate Paul Kimball,[1] the Defendant in this action. Mr. Kimball told Lieutenant Pepper that he had something important, something "big", to talk about, but he did not elaborate on what that was. Captain Green and Lieutenant Pepper decided to meet with Mr. Kimball the next morning.

Around 8:45 a.m. on December 5, 2003, Captain Green and Lieutenant Pepper had a meeting with Mr. Kimball and Clifford Perry, another prison inmate, in a conference room in the administration corridor of the Utah State Prison. No Miranda warnings were issued at that time. During that meeting, Mr. Kimball and Mr. Perry told the two prison officials that they had found a gun in the prison. They asked what they would receive in exchange for turning over the gun. Prompted by questions from Captain Green and Lieutenant Pepper, the inmates revealed the location of the gun. The prison officials then stopped the interview because they wanted to lock down the prison facility and retrieve the gun. Mr. Kimball does not seek to suppress any statements he made during this encounter.

Mr. Kimball and Mr. Perry were sent back to their cells. The prison was locked down. About 11:00 a.m., prison officials retrieved the gun based on the information provided by Mr.

---

[1] Mr. Kimball had Lieutenant Pepper's cell phone number and authority to call the number. He had been a source of reliable information for Lieutenant Pepper regarding contraband in the prison at least since January 2003.

Kimball and Mr. Perry during their earlier meeting. Then prison officials began an internal criminal investigation to determine how the gun got into the prison, why it was there, and who was responsible.

Investigators interviewed various individuals throughout the day. At some point, based on information they had received from other inmates being interviewed, they brought Mr. Kimball back to the administration corridor to be interviewed because he had become a "person of interest" to the investigators.

The interview of Mr. Kimball began about 3:45 p.m. that afternoon. Investigator Eric Varoz and Investigator Brent Wiechman conducted the interview. Mr. Kimball was not handcuffed at this point. At the beginning of the interview, the two investigators introduced themselves and told Mr. Kimball the purpose of the interview.

> Q   So what did you tell him the purpose of the interview was?
>
> A   That there had been a weapon found in the institution, and generally whether or not he had any knowledge of who may be responsible for that being introduced to the – into the prison.
>
> Q   After you introduced yourselves and expressed the purpose of the interview, what happened?
>
> A   He [Mr. Kimball] told us that he didn't know anything about the weapon being brought into the prison, and subsequently told us that he would tell us the whole story, but he had some demands, <u>one of those demands being an attorney present</u>, and then that we would put something in writing in relationship to these requests that he had made.

(Feb. 24, 2005 Evidentiary Hearing Transcript (hereinafter "Tr.") at 44 (emphasis added).) As soon as Mr. Kimball demanded an attorney, the investigators ended the interview. The entire interview lasted about five minutes and no <u>Miranda</u> warning was given at that interview. Mr.

Kimball made no incriminating statements and does not seek to suppress any statements he made during that 3:45 p.m. interview.

During that day's investigation, prison officials decided to transfer Mr. Kimball, who was living in the prison's C-Block, to a higher security area of the prison. However, such arrangements take time,[2] so, in the meantime, they kept Mr. Kimball in one of the conference rooms in the administration corridor. A few hours passed, during which time Mr. Kimball was simply waiting in a conference room, being guarded by a uniformed security officer.[3]

Later that day, in the early evening, Captain Green was contacted by someone in the prison (he could not recall who gave him the information when he testified at the hearing) who said that Mr. Kimball wanted to talk to Annette Velarde. Captain Green testified that "[t]here was an officer sitting with [Mr. Kimball]. I believe it was around – it was close to 6:00 o'clock. He said – the officer called – either called me or somebody came down to my office, I don't recall which, indicating that Kimball had said to the officer in the room that he wanted to talk to

---

[2]According to Investigator Wiechman, Mr. Kimball could not go back to his cell. He was to be taken to "Uinta," a higher security area of the prison. But that transfer was delayed, as Investigator Wiechman testified: "He would have been housed in a more secure location. Sometimes it takes some time to move other inmates out of cells to make – it's kind of a domino effect. You may have to move other inmates out to make room for other inmates, so – but there was no way he was going back into that cell. . . . [H]is roommate at the time was Perry, who was also involved, who we knew at the time was involved with the situation, and as things were growing, there was no way – as far as safety and security of the institution is basically what it is, your Honor." (Tr. at 66.)

[3]Regarding the reason why Mr. Kimball was kept in the room under guard, Investigator Wiechman testified that "I think there was about 30 other inmates they were talking to at the time, so we were just waiting for other information to come in. We didn't still know at the time Defendant – Kimball and Perry, [what] everybody's role in the whole situation was, so they just left them in there to figure out where he was going to be housed and where we were going to move everybody." (Tr. at 65.)

Annette Velarde, or he was willing to talk to Annette Velarde." (Tr. at 23-24.)

Annette Velarde is a Department of Corrections employee who was Mr. Kimball's case manager for three and a half years at the prison. She is not a criminal investigator. During the time she was Mr. Kimball's case manager, the two developed a rapport. "If there's an inmate that you could like, he's probably the easiest for me to get along with." (Tr. at 50.) It appears that Mr. Kimball trusted Lieutenant Velarde.

Captain Green approached Lieutenant Velarde, who was working at the prison that day, and said that Paul Kimball wanted to talk to her and asked whether she would mind talking with him. Lieutenant Velarde was not involved in the investigation that day regarding the gun, but she was aware that it was happening and the reason why. She agreed to talk to Mr. Kimball. Captain Green instructed her "not to ask [Mr. Kimball] any questions like investigative questions because [she is] not an investigator." (Tr. at 51.)

Lieutenant Velarde went to the conference room where Mr. Kimball was being held. She said that a S.W.A.T. officer was in the room with Mr. Kimball, who was not handcuffed. The following is Lieutenant Velarde's description of the conversation she had with Mr. Kimball:

> Q   Did you then start to talk to the Defendant?
>
> A   Yeah. We had a conversation, just kind of small-talk, for probably 20 minutes, just normal stuff. I visited with him a lot over the years, so it wasn't unusual to just visit with him.
>
> Q   Did the Defendant indicate to you why he wanted to talk to you?
>
> A   I wouldn't say so in the beginning. Towards the end of the conversation he did ask it if was an officer, what should he do.
>
>> THE COURT:   So he initiated the conversation? That's why you went because you heard he wanted to speak with you; right?

THE WITNESS: Correct. That's correct.

Q When you first met with him and went in that room, did you clarify that with the defendant about why you were there?

A To visit with him? I asked him what he wanted. He asked to see me, so I just said, "Hey, what's going on?" and we just had small-talk.

Q Did the Defendant confirm that he wanted to talk to you?

A I don't know that he – I don't know that when I got in the room that he said, "I asked to see you." I don't know that he actually specifically said those words.

Q But when you got there, did he start talking to you?

A Yes.

Q Now, this part you just mentioned about whether it was an officer, what did you take that to mean?

A With all the stuff that had been going on, I mean obviously we hear rumors as staff members there, and I assumed or I believed that he was leading into if an officer had done something for him, what should he do?

Q What do you mean by if an officer had done something for him?

A Say that an officer had brought something in for him.

Q Into the prison?

A Yes.

Q When he mentioned that an officer may be involved, what happened?

A Well, my statement back to him is that, "You should roll that person over. That person puts the rest of the officers out there in jeopardy."

Q What do you mean by roll that person over?

A Turn them in. Tell on them.

Q Then what did the Defendant say?

> A        He said okay. And he said he was ready to talk. And at that point I went and got the other investigator because it's not my job to talk to him about that.

(Tr. at 52-54.) Lieutenant Velarde left the room and returned with Investigator Wiechman.

Mr. Kimball asked that Lieutenant Velarde stay in the room during the interview. She observed the interrogation. She said that Mr. Kimball was not handcuffed and that she did not see Investigator Wiechman do anything inappropriate during the interview. When Investigator Wiechman was asked at the evidentiary hearing why Mr. Kimball wanted Lieutenant Velarde to stay in the room, he responded: "I think he just felt more comfortable with her in there, that I wouldn't take advantage of him or anything like that, to be honest with you." (Tr. at 68.)

Investigator Wiechman went into the room, confirmed with Mr. Kimball that he wanted to talk, and gave Mr. Kimball a verbal <u>Miranda</u> warning (which was read verbatim from a <u>Miranda</u> warning card). He also asked Mr. Kimball two questions. The first was "Do you understand each of these rights I've explained to you?" (<u>See</u> Tr. at 63.) Mr. Kimball said he understood the rights. The second was "Having these rights in mind, do you wish to talk to us now?" (<u>See</u> <u>id.</u>) Mr. Kimball responded by saying he agreed to talk. During the interview Mr. Kimball never mentioned an attorney and never requested that the interview stop. Instead, he provided incriminating information regarding his involvement with the gun. It is this confession that Mr. Kimball now seeks to suppress.

## CONCLUSIONS OF LAW

The only issue this court needs to decide is whether Mr. Kimball, who previously asserted his right to have an attorney present during questioning, freely and voluntarily re-initiated contact with prison officials, and, if so, whether under the totality of the circumstances he made a

knowing and intelligent waiver of his right to counsel.  See Oregon v. Bradshaw, 462 U.S. 1039, 1044-45 (1983); Edwards v. Arizona, 451 U.S. 477 (1981).  The government has the burden of proving, by a preponderance of the evidence, that Mr Kimball did both.  See, e.g., United States v. Roman-Zarate, 115 F.3d 778, 782 (10th Cir. 1997).

**Did the Defendant re-initiate contact after invoking his right to counsel?**

The United States Supreme Court has held that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).  The Court also held, in Brewer v. Williams, 430 U.S. 387 (1977), that "a valid waiver of counsel rights should not be inferred from the mere response by the accused to overt or more subtle forms of interrogation or other efforts to elicit incriminating information." Edwards, 451 U.S. at 484 n.8 (emphasis added).  "If police initiate subsequent contact without the presence of counsel, [the defendant's] statement will be presumed involuntary, even where his statements would otherwise be deemed voluntary under traditional standards." Pickens v. Gibson, 206 F.3d 988, 994 (10th Cir. 2000).  According to the bright line rule stated in Edwards, reading a defendant his Miranda rights after he has asked for an attorney does not cure the problem created when police, rather than the defendant, re-initiate contact.  United States v. Giles, 967 F.2d 382, 386 (10th Cir. 1992); United States v. Kelsey, 951 F.2d 1196, 1198-99 (10th Cir. 1991) (citing Arizona v. Roberson, 486 U.S. 675, 686 (1988)).

The parties do not dispute that Mr. Kimball requested an attorney during the afternoon interview (the second encounter with officials), nor do they dispute that prison officials stopped

the interview at that point. The issue is whether the government has proven by a preponderance of the evidence that Mr. Kimball re-initiated contact with prison officials of his own accord later in the day, which contact led to the evening interview (the third encounter) and Mr. Kimball's confession. He contends that the government has not met its burden of proof because it has not identified, much less presented testimony from, the individual who spoke to Captain Green about Mr. Kimball's request, and so it cannot verify that Mr. Kimball did indeed ask to see and talk to Annette Velarde. That is, Mr. Kimball contends that "Captain Green's testimony not only failed to reliably establish that Kimball indeed stated that he wanted or was willing to talk to Officer Velarde, but also failed to establish, if the statement was made at all, under what circumstances the statement or request was made – and whether it was the result of some other contact that was initiated by the police." (Def.'s Proposed Factual Findings & Legal Conclusions (Dkt. No. 78) at 9.) The court disagrees.

Defendant essentially asks the court to find that Captain Green, or the individual Captain Green spoke to, made up a statement that Mr. Kimball asked to see Lieutenant Velarde of his own accord. Further, Defendant asks the court to speculate that Lieutenant Velarde was used by the prison investigators to subtly coerce Mr. Kimball into agreeing to talk to officials. But there is nothing in the record to give the court serious reason to doubt that the out-of-court statement (that Mr. Kimball asked to talk to Annette Velarde) was made and that the statement is true. See, e.g., United States v. Merritt, 695 F.2d 1263, 1270 (10th Cir. 1982) (holding that court is allowed to admit and consider hearsay evidence during suppression hearing and give credence to the evidence, particularly if it is corroborated by other testimony at the hearing and "nothing in the record raised serious doubt about the truthfulness of what had been said").

In addition, Lieutenant Velarde's credible testimony corroborates Captain Green's credible testimony. For example, it is clear that Mr. Kimball had something weighing on his mind that he wished to discuss with Lieutenant Velarde, a person at the prison whom he apparently trusts. This suggests that Mr. Kimball desired and independently sought out Lieutenant Velarde's advice. Second, Mr. Kimball brought up the issue first in his conversation with Lieutenant Velarde. The only thing Lieutenant Velarde asked him when she first entered the room was something to the effect of "Hey, what's going on?" Small talk ensued and then Mr. Kimball asked for Lieutenant Velarde's advice about what he should do if he had information that an officer was involved with smuggling the gun into the prison. Third, Captain Green expressly instructed Lieutenant Velarde to refrain from asking any investigatory questions because she was not an investigator. This is contrary to Defendant's theory that prison officials sent Lieutenant Velarde to talk with Mr. Kimball in an effort to subtly coerce Mr. Kimball to make incriminating statements.

The court also finds that Lieutenant Velarde's initial question to Mr. Kimball – "Hey, what's going on?"– was not a communication that would be considered re-initiation of an interview or interrogation regarding the gun. "The term 'interrogation' refers to 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Roman-Zarate, 115 F.3d 778, 782 (10th Cir. 1997) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). See also United States v. Comosona, 848 F.2d 1110, 1112 (10th Cir. 1988) (holding that police officer's invitation to defendant to call him collect did not constitute impermissible interrogation and so did not re-initiate contact in violation of

defendant's Miranda rights).

The court concludes that Mr. Kimball voluntarily re-initiated contact with prison officials after invoking his right to counsel pursuant to Miranda v. Arizona, 384 U.S. 436 (1966).

**Did Mr. Kimball knowingly and intelligently waive his right to counsel?[4]**

"[E]ven if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983). The government must demonstrate that Mr. Kimball's waiver of his right to counsel was "knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." Edwards, 451 U.S. at 486 n.9.

The court has already found that Mr. Kimball re-initiated the conversation with prison officials of his own accord. Also, Mr. Kimball demonstrated that he knew how to assert his right to an attorney during the afternoon questioning. During the evening interview, he never requested an attorney. This suggests that he made a conscious decision to waive his right to an attorney during the evening interview. Mr. Kimball was properly informed of his rights, said he understood them, and said that, despite knowing and understanding his rights, he wanted to speak

---

[4]Apparently, Mr. Kimball does not allege that during the evening interview there was duress or coercion by the police. (See Defendant's Proposed Factual Findings & Legal Conclusions at 7.) Nevertheless, the court will briefly address this factor.

to authorities.  Nothing in the record indicates any physical or psychological coercion.[5]

Based on the totality of the circumstances, the court finds that Mr. Kimball knowingly and intelligently waived his right to counsel.

## ORDER

For the foregoing reasons, Defendant Paul Kimball's Motion to Suppress Confession is DENIED.

DATED this 16th day of May, 2005.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge

---

[5] Mr. Kimball points out that he was in custody in the administration corridor under guard for the hours between the afternoon and evening interviews.  He suggests that something might have happened during that time to coerce him into re-initiating contact.  But as the court noted earlier, nothing in the record supports such a speculative theory.  Moreover, the mere fact that he was held in one of the conference rooms under guard rather than being taken somewhere else in the prison (presumably away from the investigation area) is not enough to establish any coercion, subtle or otherwise, on the part of prison officials, or intent of prison officials to keep him near in the hopes of re-initiating the dialogue about the gun.  The record contains a valid reason why Mr. Kimball was held – the delay was caused by the logistics of placing him in a more secure cell in the prison.